UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DUNKIN' DONUTS FRANCHISED
RESTAURANTS LLC, DD IP HOLDER          Case No. 08-12836
LLC, BASKIN-ROBBINS                     (consolidated with 08-14213)
FRANCHISED SHOPS LLC, BR IP            HONORABLE STEPHEN J. MURPHY, III
HOLDER LLC, and DB REAL ESTATE
ASSETS I LLC

          Plaintiffs,

v.

SHRIJEE INVESTMENT, INC., SHREE
HARI, INC., BIKHABAI D. PATEL, and
VISHNU A. PATEL,

          Defendants.

_____/

**OPINION AND ORDER**
**GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS**
**IN CASES 08-14213** (docket no. 4) **and 08-12836** (docket no. 6)**,**
**GRANTING IN PART AND DENYING IN PART**
**PLAINTIFFS' MOTION TO DISMISS IN CASE 08-12843** (docket no.8)**, AND**
**CONSOLIDATING CASE NOS. 08-14213 AND 08-12843 WITH CASE NO. 08-12836**

**INTRODUCTION**

The parties to this litigation are Dunkin' Donuts and Baskin-Robbins, and various

business entities related to them (hereinafter collectively "Dunkin'") on one side, and

Dunkin' franchisee corporations, their shareholders, and a franchisees' association on

the other. The controversy arose when the defendants in cases 08-12836 and 08-

14213 found themselves unable to pay their monthly franchise fees, allegedly as a

result of Dunkin's attempts to drive them out of business. After (purportedly) terminating

the franchise agreements on these grounds, Dunkin' filed suit against the franchisees to

enjoin their continued use of its trademarks, and they (along with their franchisee association) have filed a responsive suit alleging that Dunkin' breached both the express terms of their contracts and its implied duty of good faith and fair dealing, as well as tortiously interfering with their attempts to sell their franchises.

The defendants in case number 12836 (hereinafter "*Silver Days*") are Mr. Salim Ali and two corporations – Silver Days, Inc., and Shermin, Inc. – through which Mr. Ali owns and operates Dunkin' Donuts shops in Dearborn, Canton, and Lincoln Park, Michigan. Collectively, these parties will be referred to as "Ali." The defendants in case number 14213 (hereinafter "*Shrijee*") are Mr. Bikhabhai Patel, who owns and/or oversees the operation of two Dunkin' franchses in Southfield, Michigan, and additional franchises in Detroit and Warren, Michigan; and two corporations – Shrijee Investment, Inc., and Shree Hari, Inc. – through which he owns and operates at least some of these franchises. These parties will be collectively called "Patel." Ali and Patel are plaintiffs in case number 12843 (hereinafter "*Ali*"), along with the Detroit Dunkin' Donuts Franchisee Association, LLC, which has as its members approximately 18 southeast-Michigan Dunkin' franchisees. Because Dunkin' Donuts has created many joint franchises with Baskin-Robbins, the plaintiffs in *Silver Days* and *Shrijee* are Dunkin' Donuts Franchised Restaurants LLC, DD IP Holder LLC, Baskin-Robbins Franchised Shops LLC, BR IP Holder LLC, and DB Real Estate Assets I LLC. Only Dunkin' and Baskin' are defendants in *Ali.*

Because (1) all these limited liability companies are registered in Delaware and have their principal places of business in Massachusetts, (2) the parties on the other side of these cases are all citizens of Michigan and Ohio, and (3) the amount in

controversy in each case exceeds $75,000, this Court has diversity jurisdiction over each case.  It also has jurisdiction under the Lanham Act. 15 USC 1116(a), 1121.

*Silver Days* and *Shrijee* are before the Court on Dunkin's motions for preliminary injunctions against the defendants' continued use of its trademarks in the operation of the terminated franchises.  Ali and Patel oppose those motions on the grounds that Dunkin' should be estopped from terminating their franchise agreements because, they claim, it has deliberately created the purported grounds for termination by its own misdeeds.  Based on this alleged wrongdoing, they have also filed counterclaims for breach of contract, violation of covenants of good faith and fair dealing, and tortious interference with business opportunities.

In *Ali*, the individual franchisees reassert these claims for money damages, and their franchisee association additionally requests on behalf of its members that the Court enjoin Dunkin' from further expansion in the Detroit market.  That case is before the Court on Dunkin's motion to dismiss the claims by the franchisee association on the ground that it lacks standing, and those by the other plaintiffs on the ground that they are improperly joined as plaintiffs.

I.  FACTS

A.  The Contracts; Ali's and Patel's Defaults

The following facts are undisputed.

On behalf of themselves and their corporations, Ali and Patel signed franchise agreements with Dunkin' whereby they agreed to, among other things, pay a portion of each shop's weekly gross sales – ranging between 4.9 and 5.9 percent – in franchise fees, and an additional 5% of weekly gross sales in advertising fees.  Franchise

agreements, docket no. 8 exs. 1-3 (case no. 08-12843), §§ 4.3 & 4.4. The lease agreements provide that failure to timely pay these fees would result in a default. *Id.* § 9.0.5. The agreements provided for a seven-day cure period in which the arrearages could be paid, *id.* § 9.1.1, after which time the agreement was to terminate on Dunkin's conveyance of notice to the franchisee, *id.* § 9.4. In the event that a franchisee defaults with respect to one of his shops, the agreement provides that he shall be in default with respect to all of them. *Id.* § 9.0.4. The franchise agreements granted defendants the right to, among other things, use Dunkin's trademarks in conjunction with their shops. *Id.* § 1.0.

Several of Ali's and Patel's shops have fallen behind in paying their franchising fees, advertising contributions, and other amounts due. As of June 2008, Ali's Dearborn franchise owed about $92,000; the corresponding numbers for his Canton and Lincoln Park shops were about $117,000 and $31,000, respectively. As of September 2008, Patel's owed about $23,000 for his Detroit shop, $4,000 for his Toledo shop, $78,000 for the Warren shop, and $59,000 and $7,000 for the respective Southfield shops. During 2007 and 2008, Dunkin' sent numerous notices of default to Ali for the Dearborn and Canton shops, and in 2008 sent two similar letters with respect to the Lincoln Park shop. Patel received similar notices during the same time frame for his Detroit and Warren shops and one the two Southfield stores that was more greatly in debt to Dunkin'.[1]

---

[1] Some of the shops controlled by Ali and Patel are thus not directly in default, but Dunkin' has purportedly terminated those franchises pursuant to the cross-default provision of the franchise agreements. Although some of these shops are technically franchised to corporations different from the ones that own and operate the directly defaulted franchises,

4

Although it appears that neither Ali nor Patel cured any of the defaults, Dunkin' did not send them notices of termination until June 18, 2008 (for Ali) and September 19, 2008 (for Patel). Despite these uncured defaults and notices of termination, the shops continue to operate as Dunkin' Donuts and Baskin-Robbins.

B.  Ali's and Patel's Claim that Dunkin' Intentionally Caused the Defaults

Ali and Patel claim that Dunkin' has deliberately created financial hardship for them in an attempt to drive them out of business. Although their direct evidentiary support as to Dunkin's motive for doing so is scanty, they suggest that this course of action would permit Dunkin' either to acquire their franchises for itself at little or no cost, or to eliminate competition for a newer wave of franchisees who will each own a larger number of stores and thus (they say) offer more financial stability.

The franchisees' allegations in this regard can be grouped into two broad headings. First, both Ali and Patel claim that Dunkin' has introduced far more franchises into southeastern Michigan than it is capable of sustaining in the current economic climate, and plans to introduce yet more – and that it has categorically refused to permit existing franchisees to acquire any of these new franchises.[2] This business strategy, they claim, has had the effect of driving some of their previously profitable franchises into the red. Second, Ali and Patel claim that Dunkin' has withheld its consent from numerous proposed sales of their franchises, which has prevented

they are all in fact controlled by Ali and Patel, and there appears to be no dispute that the cross-default provision applies to all those shops.

[2]  Dunkin' denies categorically disqualifying existing franchisees from acquiring expansion franchises, and instead states that it has evaluated its current franchisees' fitness to expand on a case-by-case basis.

them from either escaping the impossible situation created by its aggressive practices, or from raising the capital needed to cure the defaults on their other stores and try to return them to profitability.

The specific facts in support of these allegations are as follows. Ali claims that in 2004, over his objections, Dunkin' created a new franchise only 1½ miles from his Dearborn location, and that the sales totals from this franchise have been nearly double those of his own. As a result, Ali's Dearborn store was unable to generate enough sales to cover its fees. When Ali attempted in 2007 to sell the Dearborn and Lincoln Park stores to four separate existing franchisees, he was told by each that Dunkin' would not allow them to expand.[3] When Ali subsequently complained to Dunkin' management about its obstruction of his sales, they offered to repurchase all three of his franchises for $500,000, which he claims is only one-fifth of their value.[4]

Patel claims that the revenues from his Detroit store have been cut in half – to well below his break-even point – because four new Dunkin' franchises have opened within

---

[3] Ali also claims that a later prospective buyer who was not an existing franchisee lost interest in the Dearborn store when Dunkin' declared that the buyer would have to acquire at least three additional franchises – only to have Dunkin' reverse course and permit him to buy a single franchise elsewhere in Detroit that was not owned by Ali. His allegations as to Dunkin's representations to the prospective buyer appear to be hearsay, however, and as such the Court regards them as suspect, at best.

[4] Ali claims that Dunkin' stymied another later sale of his Dearborn and Lincoln Park stores when it told the buyer, who had just acquired a Dunkin' franchise elsewhere, that Ali's stores were outside the geographical area within which the buyer was required (by his existing franchise agreement with Dunkin') to acquire a minimum number of additional franchises. This assertion, of course, is also based on inadmissible hearsay. Additionally, since Ali does not claim that Dunkin's representation was inaccurate, or that it did anything whatsoever to actually block the sale, this would not appear to be evidence of impropriety on Dunkin's part.

three miles of its location.  In response, Patel claims that he has repeatedly attempted to sell this store or others of his stores, but that each time Dunkin' withheld its consent to the transfer.  In 2005, as it was permitted to do under the franchise agreement, Dunkin' vetoed a proposed sale for $220,000 because it was not confident in the buyer's ability to speak English, despite her attendance at a community college in Michigan.  A 2006 agreement to sell the Detroit store and both Southfield stores for approximately $1.4 million was rejected by Dunkin' without explanation.  It rejected another 2006 agreement, to sell the Detroit store for $155,000, on the basis that the purchase price was so high as to impair the buyer's ability to operate the store.  In February 2008, Dunkin' rejected two proposals by Patel to sell his stores – one to sell a Southfield store for $575,000, on the stated reason that the businessman who had offered to buy had no experience with restaurants; and another to sell the other Southfield store along with the Warren and Detroit stores for $1.5 million, for the stated reason that the price was too high.  After this second sale fell through, the prospective buyer made a new offer – $1.7 million for the Warren and Detroit stores, along with the other Southfield store.  This price reflected Dunkin's request that Patel's original offer to sell for  $2 million be reduced, but although it was willing to approve the sale at this price, Dunkin' also sent the buyer a letter stating that the gross sales of the three stores might be too low to support the purchase price.  This resulted in the offer being withdrawn.

Patel also notes that he is currently subleasing one of his Southfield stores from Dunkin', which is itself leasing the store from the owner.  Patel claims that he originally leased directly from the owner at a much lower rent than he currently pays Dunkin', but

that he assigned this lease to Dunkin' (and agreed to two rent increases) in consideration of Dunkin's promise to permit him to add a Baskin store to his Dunkin' franchise at the site. Dunkin' has not done so.

C. Evaluation

The Court notes that the franchisees' theory – that Dunkin' is executing a grand scheme to drive them and other franchisees out of business – does not entirely explain the facts they present. If Dunkin' really had made business conditions intolerable for Ali's and Patel's franchises, it is difficult to understand why it would have to go to such lengths to shoo away investors interested in purchasing the franchises. Further, Ali's allegation that Dunkin' steered one buyer away from him and toward another existing franchisee is inconsistent with his claim that Dunkin' is trying to squeeze out its existing franchisees on a wholesale basis. Finally, Ali and Patel offer no explanation of why, if Dunkin' is trying to replace them with larger franchisees, it does not simply permit those franchisees to buy their stores.

In addition, standing alone, much of the evidence presented by Ali and Patel would be only slightly probative of the franchisees' claims as to Dunkin's motives. While Ali claims, and Dunkin' does not deny, that Dunkin' precluded four separate sales of three of Ali's franchises, Ali makes no assertion as to whether or not the prospective buyers were in fact qualified to buy the stores. Indeed, Dunkin' had existing franchise relationships with each of the prospective buyers, and on this record there is nothing to contradict the natural inference that Dunkin' simply concluded, based on its knowledge of their businesses, that all of them had their hands full already. Similarly, Patel asserts that Dunkin' has blocked sales of his franchises on various grounds, but his evidence

8

that its reasons for these objections were pretextual is fairly weak.  He claims, for instance, that the prospective buyer who was rejected for insufficient English fluency had "attended" a community college, but does not aver that she completed a degree or even a single course there.

When read as a whole, the evidence does offer some minimal level of support for the franchisees' theory.  Ali and Patel each claim, without contradiction from Dunkin', that one of their stores has been driven into financial trouble by Dunkin's crowding it out with newer franchises.  On top of this, each of them has had serious difficulty putting together a proposed sale to which Dunkin' would consent, and Dunkin's offer for all three of Ali's stores was lower than a price that had attracted an "interested" buyer for a single one of them.  Patel also claims that Dunkin' repeatedly objected that the price to be paid for his franchises by willing buyers was too high.  It is possible to conclude from this evidence that Patel dealt with a series of underinformed buyers – but it is also possible that the buyers were being perfectly rational, and that Dunkin' had some other reason for objecting to the sales.  Even if the plaintiffs have not articulated a complete explanation for these occurrences, they are sufficient to raise some suspicion that *something* untoward might possibly be afoot.

Based on the record evidence, then, the Court concludes that the franchisees' claims of wrongdoing by Dunkin', while far from definitively established, are at least colorable enough to require the Court briefly to consider their potential legal significance.  It will do so in the course of its assessment of Dunkin's likelihood of success on the merits of its infringement claim.

## II. PRELIMINARY INJUNCTION MOTIONS

In *Silver Days* and *Shrijee*, Dunkin' has moved for preliminary injunctions against Ali's and Patel's continued use of its trademarks. The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996), cert. denied, 519 U.S. 807 (1996). The Supreme Court and the Sixth Circuit have noted that "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). The Sixth Circuit, however, has advised that "a preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

When considering whether to grant the "extraordinary" remedy of a preliminary injunction, a district court must consider and balance four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the preliminary injunction; (3) whether issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citations omitted). These four factors "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (citation omitted). A district court must make specific findings concerning each of the four factors unless fewer are

dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995); *Jones*, 341 F.3d at 476 (citations omitted) (a court "is not required to make specific findings concerning each of the four factors used in determining a motion for a preliminary injunction if fewer factors are dispositive of the issue").

A.  Dunkin's Likelihood of Success on the Merits

There is no dispute between the parties that the Dunkin' Donuts and Baskin-Robbins marks used by the defendants are registered trademarks.  The Lanham Act, as codified at 15 U.S.C. § 1114(1), creates civil liability for any person who, "without the consent of the registrant," uses a registered trademark in connection with the sale of goods or services.  That is what Dunkin' claims the defendants are doing here.

This franchise agreements in this case are typical in that through them Dunkin' initially did consent to the defendants' use of its marks.  The defendants do not dispute that they have failed to pay past-due fees related to their franchises, and that under ordinary circumstances at least this would be grounds for termination under their contracts, which would include a revocation of their authorization to use the marks.  In this situation, however, they claim that the termination was improper because Dunkin' engaged in a deliberate course of action designed to (1) render their shops unprofitable and (2) prevent them from selling some of their franchises in order to raise the capital needed to continue operating the remainder.  Because of this, they claim that Dunkin' should be estopped from enforcing the termination, and thus that the franchise agreements – including defendants' authorization to use Dunkin's marks – should be regarded as still in force.  This causes the Court to analyze the question of whether the

11

holder of a mark under the Lanham Act can be estopped in this way from revoking its authorization for another party to use the mark.

Although the Sixth Circuit appears not to have addressed this question, the courts that have done so in recent years have come to a uniform set of conclusions. First, the use of a trademark pursuant to a terminated franchise agreement is truly "unauthorized" only if the termination was itself valid. As the Eleventh Circuit put it in *McDonald's Corp. v. Robertson*, 147 F. 3d 1301, 1308 (11th Cir. 1998):

> the Lanham Act's requirement that a franchisor demonstrate that unauthorized trademark use occurred to prevail on the merits of a trademark infringement claim against a franchisee necessitates some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the unauthorized use of trademarks by the former franchisee.

Indeed, the validity of such a termination is judged *only* by whether the franchisee had created grounds for it. So long as contractual grounds for termination exist, courts have been unwilling to find that a franchisor's own breaches of the agreement affect the termination's validity (although they will of course give rise to separate claims for damages by the franchisee). *E.g., S&R Corp. v. Jiffy Lube Int'l. Inc.*, 968 F. 2d 371, 376-77 (3d Cir. 1992) (collecting cases). This is the case even if the franchisor's termination of the agreement was really motivated by some other improper reason: if the franchisee has breached the agreement, then any wrongdoing by the franchisor may be compensable in its own right, but it will not block the termination. *Id.*

The Court agrees that the only question relevant to the effectiveness of a franchisor's withdrawal of consent for a franchisee to use its marks is whether the franchise termination was "proper"; that is, whether under the circumstances and the

governing law, it was effective in terminating the franchise. Even if the termination was so wrongful as to give rise to an action for damages under the relevant law, if it in fact ends the franchise it also ends the franchisee's Lanham Act authorization to use the marks.

The question of whether a contract has actually been terminated, which includes the question in this case; that is, whether a franchisor's alleged prior breach of a contract deprives its purported termination of effectiveness[5] is, however, a question of state law. *See, e.g., Papa John's Int'l v. Specktacular Pizza, Inc.*, No. Civ.A 305CV515H, 2005 WL 3132337, at *3 (W.D. Ky. Nov. 21, 2005). The Court is not free to draw its own conclusions on this question, but must instead be guided by the law of Massachusetts, which the parties in this case selected to govern their contractual relationship. Franchise Agreement, § 17.0.

Although the parties have not briefed the question, it appears that in Massachusetts, "a breach caused solely by the other party's behavior is generally excused," *Peabody N.E., Inc. v. Town of Marshfield*, 426 Mass. 436, 441 (1998). In *Rigs v. Sokol*, 318 Mass. 337 (1945), the plaintiff agreed to buy the defendant's restaurant, but conditioned his agreement on his ability to obtain a liquor license for the facility.

---

[5] In keeping with the discussion and cases cited above, federal courts have consistently answered the question in the negative. But, most of those federal cases dealt with weaker legal arguments than the one made by the franchisees here. Typically, a franchisee attempting to raise a contractual unclean-hands defense to a Lanham Act action simply claims that the franchisor breached the agreement in some manner unrelated to the franchisee's own breach, *E.g., S&R*, 968 F. 2d at 373; or that the franchisor was seizing upon some technical violation of the agreement in order to terminate it for more nefarious reasons, *e.g., McDonald's Corp.,* 147 F. 3d at 1308-09. Ali's and Patel's arguments, however, go beyond this to include allegations that Dunkin' deliberately caused their own breach. As will be explained, this is a stronger argument for estoppel.

Sokol, however, had second thoughts about the sale, and applied for a renewal of his own license, which under local law could only be denied for cause and which precluded the grant of a parallel license to Rigs. *Id.* at 341. Sokol then claimed that he was not required go through with the sale, because a condition of the contract had not been met since Rigs had failed to obtain a license. The Massachusetts Supreme Court found that

> It does not lie in the defendants' mouths to make this contention. [T]he plaintiff did all within his power to procure a license[, and] his failure to obtain it was attributable to the [conduct] of Sokol in applying for and obtaining a renewal of his license covering the same premises. It would be contrary to fundamantal [sic] principles of justice to allow the defendants to reap any advantage from the plaintiff's noncompliance with this condition in these circumstances.

*Id.* If Ali and Patel's theory that Dunkin' has intentionally caused their defaults is accurate, this case would bear significant similarity to *Rigs*, and it might be that Dunkin' would therefore be estopped under Massachusetts law from withdrawing its contractual authorization for them to use its marks.

It is unnecessary to come to a firm conclusion on this matter, however,[6] because the evidence presented by Ali and Salim is ultimately insufficient to create a serious question as to whether their defaults have been caused solely by Dunkin' alleged

---

[6] Nor need the Court decide on the effect § 9.5 of the franchise agreements, which provides that the existence of claims against Dunkin' by the franchisees will not bar Dunkin's enforcement of a termination. If effective, this would essentially waive any estoppel that might otherwise arise from efforts by Dunkin' to force its franchisees into default. As the Court finds Dunkin' likely to succeed on the merits on other grounds, it expresses no view as to the validity of such a waiver under Massachusetts law. *Cf. Dunkin' Donuts Franchised Restaurants, LLC v. D&D Donuts, Inc.*, 566 F. Supp. 2d 1350, 1356 (M.D. Fla. 2008) (rejecting defense similar to one at issue here on basis of contract provision).

intentional efforts to drive them into unprofitability.  As has been noted, their theory as to Dunkin's motives is plausible, but it is ultimately just that, a theory, and it is unsupported by anything but fairly weak circumstantial evidence.  Although the evidence may lead to any number of conclusions, it is not entirely consistent with the intentional frustration of Ali's and Patel's performance that might possibly preclude termination here.  Much of it is also suggestive of equally plausible and more innocent explanation.  In this light, and in the face of the undisputed fact of Ali's and Patel's nonpayment of monies due, the Court concludes that the record evidence indicates that Dunkin's termination of the franchise agreements was indeed proper, and thus that its concomitant revocation of their authorization to use its marks was effective.  Dunkin' has therefore demonstrated a substantial likelihood of success on the merits of its infringement claim.[7]

### B.  Irreparable Harm

"The law of this Circuit holds that no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases."  *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F. 3d 1047, 1056 (6th Cir. 1999) (citing *Wynn Oil Co. v. Am. Way. Servs. Corp.*, 943 F. 2d 595, 608 (6th Cir. 1991).  "The irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values."  *Wynn*, 943 F. 2d at 608 (citation and internal quotation marks omitted).   While Dunkin' has made no showing

---

[7]  This conclusion is consistent with that of the Eastern District of Pennsylvania in *Dunkin' Donuts, Inc. v. Liu*, No. 2002 WL 323 482380 (E.D. Pa. Dec. 21, 2000).  There the defendant also claimed that Dunkin' had "targeted 'what it perceives as underperforming or undesirable franchisees for termination, with fabricated charges, so that Dunkin' can acquire the targeted franchises for no consideration and re-sell them at a substantial windfall.'"  *Id.* at *3.  The court found this argument unsupported by the evidence.  *Id.*

that the service or products provided by Ali and Patel at their now-unlicensed shops are in any way inferior to those available at other Dunkin' stores, "[i]n these cases . . . the harm stems not from the actual quality of the goods (which is largely irrelevant) but rather from [the franchisor's] loss of control over the quality of goods that bear its marks." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F. 3d 377, 382 (6th Cir. 2006). "Thus, a court need only find that a defendant is liable for infringement or unfair competition for it to award injunctive relief." *Circuit City*, 943 F. 2d at 608. Having found that Dunkin' is likely to prevail on the merits of its infringement claim, the Court also concludes that it is likely to suffer irreparable harm of this sort if a preliminary injunction does not issue.

C. Harm to Defendants

Ali and Patel protest that while any misuse of Dunkin's marks they might engage in would be a mere drop removed from the bucket of Dunkin's nationwide reputation, the issuance of an injunction would be catastrophic for their own businesses, causing all their investments and hard-earned local goodwill to evaporate in an instant. There can be little doubt that this is partly true. Although the Court doubts that Ali and Patel would be unable to salvage anything at all from the loss of their franchises, they certainly will suffer significant losses from the termination of their rights to use Dunkin's marks. Nevertheless, the possibility of defaults and forfeitures of this type is inherent in the nature of any franchising system of the type that Ali and Patel undoubtedly benefitted from in this case. Rather than hanging out their own shingles and attempting to build goodwill, expertise, and local product recognition from scratch, they agreed to pay franchise and advertising fees to Dunkin' in exchange for access to its goodwill,

business methods, and product line.  After failing for many months to pay these fees –

and in the absence of any persuasive showing that Dunkin' deliberately caused this

failure – they cannot argue that they did not assume the risk of the harm that

termination would cause them, or that it is not entirely self-inflicted.  *Cf. S&R Corp. v.*

*Jiffy Lube Int'l*, 968 F. 2d 371, 379 (3d Cir. 1992).  To hold otherwise would be to

deprive Dunkin' of the benefit of its system, and eliminate any incentive for it to operate

the system at all.  Therefore, the Court concludes that the balance of hardships here is

entirely in Dunkin's favor.

    D.  The Public Interest

There is little evidence in the record that the public interest cuts either way in this

case.  As noted, Dunkin' has adduced no evidence that Ali and Patel are operating their

shops at standards below those of authorized Dunkin' franchisees.  If they are in fact

providing inferior service or products, then the public would have an interest in avoiding

the deception that would be worked by their use of the Dunkin' marks.  In the absence

of such a showing, however, the Court is unable to conclude that the public has any

significant interest in knowing whether their coffee and baked goods – which for all the

record shows are indistinguishable from or even superior to those served at actual

Dunkin' stores – come from an actual Dunkin' franchisee.

    E.  Conclusion – Preliminary Relief

Dunkin's *prima facie* case of infringement is undisputed, and Ali and Patel's

defense lacks sufficient evidentiary support to create a serious question as to Dunkin's

likelihood of success on the merits.  Dunkin's loss of control over its marks is irreparable

harm as a matter of law, and while the corresponding harm to defendants will be

serious, they have not established that it will be anything other than entirely self-inflicted.  As a preliminary injunction also would not harm the public interest, the Court will issue one against Ali's and Patel's continued use of the Dunkin' marks.

F.  Bond

Finally, Rule 65 of the Federal Rules of Civil Procedure requires that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c).  Application of Rule 65(c) has been construed by the Sixth Circuit as being within the sound discretion of the trial judge. *Urbain v. Knapp Brothers Manufacturing Co.*, 217 F.2d 810 (6th Cir. 1954). The failure to consider the question of security, however, has been considered error by the Sixth Circuit. *Beukema's Petroleum Co. v. Admiral Petroleum Co.*, 613 F.2d 626, 629 (6th Cir. 1979).

In the present case, the Court concludes that the strength of Dunkin's likelihood of success on the merits obviates any need for a bond.  Accordingly, none shall be required.

III.  MOTIONS TO DISMISS IN *ALI*

Ali and Patel re-assert and add detail to their claims of Dunkin's wrongdoing in *Ali*, by means of their verified complaint in *Ali*.  Their claims are again essentially twofold: first, that Dunkin' has in bad faith attempted to crowd out its existing franchisees by starting to introduce more new franchises than the market can support, and second, that it has unreasonably refused consent to proposed transfers of existing franchises.

Dunkin', however, has moved to dismiss this complaint in its entirety.  With respect to the plaintiff Dunkin' Donuts Franchisee Association of Detroit (hereinafter "the DDFA") and its request for injunctive relief, Dunkin' bases this motion on the plaintiff's alleged lack of standing.  With respect to Ali and Patel and their claims for money damages, it bases its motion on improper party joinder.

A.    Motion to Dismiss Claims by the Franchisee
       Association for Lack of Organizational Standing

To demonstrate the existence of a case or controversy of the kind that a federal court is constitutionally authorized to hear, a plaintiff must show that "'(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Cleveland Branch, NAACP v. City of Parma*, 263 F. 3d 513, 523-24 (2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)).

There is no dispute that Ali and Patel meet these requirements.  Dunkin's only challenge is to the standing of the DDFA.  An association of persons such as the DDFA will have standing to sue as a representative of its membership "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Cleveland Branch*, 263 F. 3d at 524 (quoting *Friends of the Earth*, 528 U.S. at 181).

"Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoted in *Sault Ste. Marie Tribe of Chippewa Indians v. U.S.*, 288 F. 3d 910, 915 (6th Cir. 2007)). Thus, when a defendant moves for dismissal based on a plaintiff's lack of standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Kardules v. City of Columbus*, 95 F. 3d 1335, 1346 (6th Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. at 501).

### 1.  Individual Members' Standing and Germaneness to Purpose

Dunkin' briefly argues that the DDFA has no standing because it has not shown that *all* of its members would have standing in their own right.  This argument rests on an incorrect statement of the law.   Associational standing requires an injury in fact not to *all* members of the organization, but rather to *any* member. The argument addressed by the Supreme Court in *Friends of the Earth*, 528 U.S. at 181, was  "that FOE lacked standing from the outset [because it] failed to show that *any* of [its] members had sustained or faced the threat of any 'injury in fact'" (emphasis added).  In rejecting this argument, the Court did not attempt to explain how the organization plaintiffs' members had standing categorically, but instead recounted the rather individualized injuries-in-fact alleged by five individual members.  *Id.* at 182-83.  *See also Retail Ind. Leaders Ass'n v. Fielder*, 475 F. 3d 180, 187-88 (3d Cir. 2007) (finding organizational standing even though only one member of the organization was injured).

Here, there appears to be no dispute that Ali and Patel are members of the DDFA, and that they at least have standing to sue in their own right. Dunkin's motion to dismiss their claims rests not on a lack of standing but on improper joinder. Thus, the Association plainly satisfies the first prong of the associational standing test.

Additionally, however, Dunkin' does not contest the statement in the verified complaint that "[t]he primary purpose of the DDFA is to serve as the official voice of all Dunkin' and Baskin' franchisees in the Detroit Market." Compl. at ¶ 9. If this is the case, then defending the continued existence of its member franchisees would appear to be germane to the organization's purpose. The only serious issue with regard to the DDFA's standing, then, is whether the nature of its claim is such that participation by individual franchisees is required.

### 2. Necessity of Individual Participation

Dunkin' claims that there are two separate reasons why individualized participation is needed to evaluate the DDFA's claims. First, it asserts that each of the 18 or so DDFA members have differing contracts, and that in order to determine whether Dunkin' has breached any of them the Court will be required to examine each one individually. Second, Dunkin' claims that its actions toward each member, and the other circumstances in which each franchise is operating, vary sufficiently that evaluation of the claims will require painstaking individualized analysis.

Courts have previously rejected the associational standing of franchisee associations on similar grounds. In *DDFA of S. Fla., Inc. V. Dunkin' Donuts, Inc*., No. 00-7455-CIV, 2002 WL 1187207, at *6-*7 (S.D. Fla. May 22d, 2002), the Court concluded that the plaintiff had no standing because, as in this case,

the Amended Complaint requires individual determinations as to whether DDI committed various torts against certain of its members and whether DDFA's members or DDI itself complied with the provisions of the franchise agreement. Accordingly, the Complaint does not raise a "pure question of law," which can be considered without the individual participation of DDFA's members.

Similarly, in ruling from the bench in *Mich. Dairy Queen Operators' Ass'n v. Int'l Dairy Queen Inc.*, No. 1:08-cv-36, 2008 WL 2566547, at *2 (W.D. Mich. June 9th, 2008), the court held associational standing to be lacking because "[f]undamentally I don't understand how a Court can meaningfully construe a contract that involves a party not before the Court."

The Court agrees with these cases, and therefore finds Dunkin's objections to associational standing to be meritorious. To the extent that the terms of the franchise agreements and the individual circumstances of the franchisees vary one from another, the DDFA's claims that Dunkin' breached its contracts with each of the DDFA's members are ill suited to mass adjudication. There simply is too great a risk that the divergences in the franchisees' contracts, or in Dunkin's actions toward each of them, will create corresponding incongruities in the facts that the Court will be required to consider, the aspects of the case that each franchisee will wish to stress, and the ultimate question whether each franchisee was actually harmed. Even if each of the individual members agrees with the DDFA's assessment of the facts of their case and its assessment of how they may be remedied, an umbrella organization such as a franchisee association simply is not in as good a position to present such subtleties to a Court.

Admittedly, it is not clear how significant the variation between the contracts actually is, and many of the form contracts in the record appear to be absolutely identical in almost all respects. What *is* clear, however, is the tremendous amount of highly individualized analysis of Dunkin's actions and the circumstances of each franchisee that would be required to adjudicate the DDFA's claims. Whether Dunkin's expansion plans were made in bad faith with respect to any given franchisee would require a detailed investigation into the neighborhood in which the franchise is located and Dunkin's expansion plans therein, as well as into its preexisting treatment of the franchisee. The Court questions whether the DDFA is even capable of providing the information necessary for this analysis without the individual participation of its members. Additionally, determining whether Dunkin's refusal to consent to any given proposed sale of a franchise was "unreasonable" will require an even more individualized inquiry into all the details of the proposed deal and Dunkin's treatment thereof. Again, such an inquiry could only be conducted with the assistance of persons with intimate knowledge of the characteristics of the proposed buyer and the negotiations surrounding the sale agreement and Dunkin's denial of consent. Only the DDFA's individual members are likely to have such knowledge.

B.  Motion to Dismiss for Improper Party Joinder

Dunkin' also moves to dismiss Ali's and Patel's individual claims, on the ground that they are improperly joined as plaintiffs in a single action. Instead, it argues, they should be required to re-file their claims as separate lawsuits.

Federal Rule of Civil Procedure 20(a) provides that

[p]ersons may join in one action as plaintiffs if:
(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrence; and
(B) any question of law or fact common to all plaintiffs will arise in the action.

Here, Ali and Patel are claiming that Dunkin's denials of their transfer requests were all part of a series of denials motivated by a common scheme, and that this scheme qualifies as "bad faith" under the identical or nearly-identical contracts governing each of their franchises. Further, they claim that Dunkin' was executing this overarching scheme with the intent to drive all existing franchisees, including both Ali and Patel, out of the market. Thus, they assert a right to relief arising out of a common series of occurrences (Dunkin's alleged systematic attempts to force its existing franchisees out of the Detroit market) and present a common question of fact (whether Dunkin's actions were motivated by such an overarching scheme). As a result, they qualify for Rule 20 party joinder, and the Court will not dismiss their claims.

The Court notes, however, that Ali's and Patel's claims in *Ali* are substantially identical to their counterclaims in *Silver Days* and *Shrijee*. Further, as should be clear for the foregoing, Dunkin's respective claims against Ali and Patel in *Silver Days* and *Shrijee* are quite similarly to each other as well. The Court may order consolidation of separate cases pursuant to Federal Rule of Civil Procedure 42(a), which provides:

> When actions involving a common question of law or fact are pending
> before the court, it may order a joint hearing or trial of any or all the matters
> in issue in the actions;  it may order all the actions consolidated; and it may
> make such orders concerning proceedings therein as may tend to avoid
> unnecessary costs or delay.

Having already concluded pursuant to Rule 20 that *Silver Days* and *Shrijee* share common questions of law and fact, the Court sees no reason why the same issues should be litigated in three separate cases.  Instead, it will consolidate the three cases, and grant Ali and Patel leave to file a joint amended counterclaim in the consolidated case.[8]

## CONCLUSION AND ORDER

Dunkin' has shown a strong likelihood of success on the merits in its motions for preliminary injunctions; although Ali and Patel have offered some evidence in support of their estoppel defense, it is ultimately far too weak to prevent the Court from finding in favor of Dunkin' on this element.  By showing that its trademarks are being infringed, Dunkin' has also satisfied the irreparable-harm prong of the preliminary injunction test as a matter of law.  Any harm to the defendants from an injunction would be self-inflicted, and the public interest does not tell against the entry of an injunction.

**WHEREFORE,** it is hereby **ORDERED** that:

---

[8]  The Court proposed this course of action to counsel for all parties at the hearing on these matters and solicited comments or objections.  None were offered.

Ali and Patel shall immediately cease the use of any and all trademarks, trade dress, and trade names belonging to Dunkin' Donuts or Baskin-Robbins;

The complaint in case number 08-12843, *Ali et al. v. Dunkin' Donuts Franchised Restaurants, LLC et al.*, is **DISMISSED** insofar as it attempts to state claims on behalf of the Dunkin' Donuts Franchisee Association, LLC;

Case numbers 08-14213 and 08-12843 are **CONSOLIDATED** with case number 08-12836.  **ALL SUBSEQUENT PLEADINGS SHALL BE ENTERED UNDER THE LOWEST CASE NUMBER OF 08-12836.**  Further, case numbers 08-14213 and 08-12843 are hereby **CLOSED** for administrative purposes;

Plaintiffs Ali and Patel are granted leave to file an amended joint counterclaim in case number 08-12836, jointly asserting substantially the same grounds for relief as their current counterclaims and their current claim in case number 08-12843.

      **SO ORDERED.**

      s/Stephen J. Murphy, III
      STEPHEN J. MURPHY, III

United States District Judge

Dated:  December 23, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 23, 2008, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager